**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RHONDA S. HARMON, | ) |
|                               Plaintiffs, | ) Case No. 2:12-cv-01419-JCM-GWF |
| vs. | ) **FINDINGS AND** |
| CAROLYN W. COLVIN, acting Commissioner of Social Security, | ) **RECOMMENDATIONS** |
|                               Defendant. | ) |

This matter is before the Court on Plaintiff Rhonda S. Harmon's complaint for judicial review of administrative action by the acting Commissioner of Social Security denying her claim for disability benefits under Title II of the Social Security Act. Specifically, Plaintiff seeks reversal of the Administrative Law Judge's ("ALJ") decision dated June 17, 2011 denying her claim for disability benefits.

The Court granted Plaintiff's Application to Proceed in Forma Pauperis on August 10, 2012. Plaintiff's Complaint was on filed August 14, 2012. Defendant's Answer was filed on March 4, 2013, along with a Notice of Filing the Administrative Record. Plaintiff filed her Motion for Remand and/or Reversal (Doc. #22) on April 11, 2013. The Defendant filed her Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal (Doc. #25) on June 11, 2013. Plaintiff filed her Reply (Doc. #26) on June 28, 2013.

**BACKGROUND**

        **A.**        **Procedural History.**

Plaintiff filed an application for a period of disability, disability insurance benefits, and supplemental security income on January 11, 2010. Administrative Record (AR) 136. The application was denied initially and upon reconsideration. AR 23, 76-79, 81-83, 126-132. Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") on August 11, 2010. AR 84. The ALJ conducted a hearing on May 11, 2011 during which the Plaintiff testified. AR 33-70. Plaintiff also submitted a letter from her son, Johnathan Garner which was included in the record. AR 194-196. The ALJ issued an unfavorable decision on June 17, 2011. AR 23-29. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a report of findings and recommendations under 28 U.S.C. §§ 636 (b)(1)(B) and (C).

**B.  Factual Background.**

Plaintiff Rhonda Harmon was born on September 11, 1965. She is 5'6" tall and weighed 200 pounds on the date of the hearing. AR 37. She has a tenth grade education and is able to read and write. She does not drive an automobile and has never had a driver's license. Ms. Harmon is divorced. AR 37-38. She has adult children, one of whom committed suicide approximately four years before the hearing. AR 41. Ms. Harmon testified that she resides with her son Johnathan Garner. AR 58.[1]

Ms. Harmon's previous employment included working as a clerk in a bus station, as a dishwasher in restaurants, and as a sales associate at Wal-Mart. *See* "Work History Report" AR 146. She testified at the hearing that her last employment was with Wal-Mart in 2008 and 2009. She worked as an overnight stocker. AR 39. According to Ms. Harmon's "Work History Report," she

---

[1] Ms. Harmon's attorney informed the ALJ during the May 11, 2011 hearing that Ms. Harmon was experiencing auditory hallucinations--that her deceased son was speaking to her on a daily basis. The attorney stated that Ms. Harmon had only recently sought psychiatric care for these symptoms because she had been afraid "that they would lock her up and tell her she was crazy." AR 41. Ms. Harmon testified at some length about these hallucinations during the hearing. AR 42-49. Ms. Harmon's attorney suggested that Ms. Harmon should be referred for a mental health evaluation if the ALJ did not find her disabled based on her chronic obstructive pulmonary disease. Under questioning by the ALJ, Ms. Harmon stated that she had experienced similar hallucinations prior to her son's death and had received psychiatric treatment and medication which relieved the symptoms. AR 63-65. The ALJ addressed Plaintiff's reported hallucinations in his decision, but concluded that the evidence was not sufficient to show that Plaintiff suffered from a mental impairment. AR 23, 26-27. Plaintiff has not raised her alleged auditory hallucinations or other alleged mental impairments as an issue in her motion for reversal of the ALJ's decision. *See Motion for Remand and/or Reversal (Doc. #22)*.

stocked shelves, helped customers, hung clothes, put away things that were brought back and unloaded pallets. AR 147. During the hearing, the ALJ asked Ms. Harmon why she stopped working at Wal-Mart. Ms. Harmon testified that she could no longer handle the stress because she hurt. The ALJ asked her if it was her physical condition that kept her from working. Ms. Harmon responded: "Actually it was more my mental." AR 39.

Medical records from the University Medical Center Quick Care Clinic show that Ms. Harmon was seen for a wheezing cough on October 6, 2008 which had lasted three days. She reported a past history of emphysema and indicated that she smoked half a pack of cigarettes a day. AR 203. She was diagnosed with bronchitis and was prescribed an Albuterol inhaler. AR 204-205.

Ms. Harmon was seen by R.D. Prabhu, M.D., apparently on referral by her disability attorney, on April 19, 2010 for a pulmonary medicine consultative examination. AR 209-242. Under History of Present Illness, Dr. Prabhu stated as follows:

> Ms. Rhonda Harmon is a 44-year-old female who is presenting here with a history of shortness of breath. The patient states that she is short of breath on minimal exertion. She states that she was told to have COPD five years ago and emphysema a couple of years ago. She was put on multiple medications including SVN treatments and inhalers. Unfortunately, she did not have any money or resources. She simply ran out of her medications. She stated that she has chronic cough and brings up sputum which is whitish in color. She gets short of breath on minimal exertion. She can walk a block. She cannot run, climb steps, or lift heavy objects. Sometimes when she coughs, she sees there is blood-tinged sputum. Sometimes her nails turn blue. Sometimes she has trouble breathing while lying down and she has breathing difficulties after falling asleep. She further complains of cough, sputum production, blood in sputum, shortness of breath, chest pain, trouble breathing while lying down, breathing difficulties after falling asleep, and dizziness. She wakes up several times at night. She has trouble getting to sleep at night. She has problems with memory and concentration. She wakes up tired and unrested in the morning.

AR 210.

Under "Past Medical, Surgical & Medications," Dr. Prabhu stated that Ms. Harmon's past medical history is remarkable for asthma, bronchitis, COPD, emphysema, hypertension, and childhood medical history of chickenpox and measles. "She was supposed to be on inhalers and SVN treatments, she ran out." Dr. Prabhu further noted that Ms. Harmon quit smoking two weeks prior to his examination and prior to that "[s]he has a 35-pack-year history of cigarette smoking."

3

AR 210.

On physical examination, Dr. Prabhu noted that Ms. Harmon "is a well-built, well-nourished female who looks chronically ill." AR 211. In regard to the chest examination, he stated that "[c]rackles are heard in the bases. Rhonchi are heard on ausculation." Id. Her heart had regular rate and rhythm, with no rub, clicks or murmurs heard. Id. Dr. Prabhu's assessment was severe chronic obstructive pulmonary disease, history of chronic bronchitis, history of emphysema. He also diagnosed obstructive sleep apnea. His plan was to proceed with pulmonary function testing. AR 211.

According to Dr. Prabhu's interpretation of the pulmonary function test:

> The patient's spirometry revealed a forced vital capacity of 2.28 L, which is 65.0% of her predicted value. FEV1 is 1.41 L, which is 48.6% of her predicted value. FEV1/FVC ratio is 61.8. This is consistent with severe obstructive ventilatory impairment. Following bronchodilator therapy, FEV1 improved by 28.6%. This is considered a significant response.
>
> A coexistent restrictive disease cannot be excluded by spirometry alone.
>
> Clinical correlation is requested.

AR 212.

Dr. Prabhu also completed a medical assessment of functional capacity regarding Ms. Harmon on April 19, 2010. According to the assessment form that Dr. Prabhu completed, Ms. Harmon could lift 10 pounds occasionally, and less than 10 pounds frequently. She was able to stand and/or walk for less than 2 hours in an 8 hour workday. She did not require assistive devices. She was able to sit for less than 6 hours in an 8 hour workday. Dr. Prabhu indicated that Ms. Harmon's need for alternative standing and sitting would be alleviated with standard breaks and a lunch period. Dr. Prabhu stated that Ms. Harmon would be able to do the following postural activities on an occasional basis: balancing, stooping/bending, kneeling, crouching/squatting, and crawling. He stated that Ms. Harmon's ability to travel was limited. Dr. Prabhu listed the following environmental restrictions relating to her impairment: temperature extremes, chemicals, and dust. AR 213-214. Dr. Prabhu's assessment placed Ms. Harmon below the functional capacity for required for sedentary work.

4

On May 14, 2010, state agency physician Mayenne Karelitz, M.D. provided a physical residual functional capacity assessment of Ms. Harmon based on the evidence in the file. Dr. Karelitz found that Plaintiff could occasionally lift 10 pounds, could lift less than 10 pounds frequently, could stand and/or walk (with normal breaks) for at least 2 hours in an 8 hour workday, could sit with normal breaks for about 6 hours in an 8 hour workday, and had the ability to push or pull, except as limited by her ability to lift or carry. Dr. Karelitz opined that Ms. Harmon could occasionally climb ramps or stairs, stoop, kneel, and crouch, that she was able to balance frequently, but could never use ladders ropes or scaffolds, or crawl. She also found that Ms. Harmon had no manipulative, visual or communicative limitations. Under environmental limitations, Dr. Karelitz stated that Ms. Harmon should avoid even moderate exposure to extreme cold or heat, and hazards such as machinery or heights, and should avoid all exposure to fumes, odors, dusts, gases, poor ventilation, etc. AR 243-250.

Dr. Karelitz noted that her findings were significantly different from those of Dr. Prabhu. She stated:

> Claimant was given an MSS for less than sedentary work. I did this RFC for sedentary work considering that the claimant was non-compliant with her bronchodilator meds. PFT showed significant improvement in her FEV1 with a dose of bronchodilator.

AR 249.

The record also contains a "Report of Contact," dated August 4, 2010, signed by Julius Villaflor, M.D. AR 258. Dr. Villaflor briefly summarized the findings in Dr. Prabhu's April 19, 2010 consultive examination. He then stated:

> The claimant has alleged dyspnea on exertion......the only significant record in file for review is a CE by Dr. Prabhu (see findings outlined above) .. hx of COPD and OSA is alleged....Dr. Prabhu suggested a less than sedentary RFC....the evidence in file does not document that a listing criteria is met...The objective exam finding and PFT in file does not support the preclusion of the ability to do sedentary level work....in this context, the RFC dated, 6/15/10 is affirmed as written.[2]

---

[2] As the Commissioner noted in her Cross-Motion (Doc. #25), pg 6, n. 3, Dr. Karelitz issued her RFC assessment on May 14, 2010. It is therefore unclear whether Dr. Villaflor was referring to Dr. Karelitz's RFC assessment. There are, however, no RFC assessments in the record besides those of Dr.

AR 258.

Ms. Harmon was seen in the emergency room of North Vista Hospital, North Las Vegas, Nevada on December 18, 2010 for an exacerbation of her COPD and acute bronchitis. AR 261-277. She was prescribed Albuterol and advised to follow up with the doctor in 3-5 days. AR 262.

Ms. Harmon was also seen at the University Medical Center emergency room on May 3, 2011, eight days before the hearing before the ALJ. AR 279-314. During this emergency room visit, she had a chief complaint of chest pain. The ER record states:

> She was initially seen at Quick Care and was referred on for further evaluation. According to the patient, she has been having chest pain on and off for about the past week. It has been coming on at rest. She describes it as hurting in the middle of her chest and does hurt through to her back. She describes it as an intermittent tightness in her chest and radiates into her left arm.

AR 279.

Ms. Harmon reported that she had never previously experienced a similar pain. During this ER visit, Ms. Harmon also reported the auditory hallucinations she had been experiencing since the death of her son three years earlier. AR 279. The ER physician noted her past history of COPD. On physical examination, her lungs were noted be clear bilaterally, There were no wheezes, rales or rhonchi. Id. Examination and testing regarding her heart was normal. Id. The physician also noted that Ms. Harmon's medications were "Albuterol MDI and nebulizer on as needed basis." AR 281. In regard to her COPD, the physician further stated:

> This is not an active problem at this moment. However, we are going to write as-needed orders for shortness of breath. The patient already quit smoking and she declines any nicotine patch at this point in time since she is not having any cravings.

AR 282.

Ms. Harmon was discharged from the hospital on May 4, 2010 in good condition. She was advised to follow up with the Southern Nevada Adult Mental Health Center in regard to her hallucinations. AR 285.

On April 19, 2012, Ms. Harmon's attorney submitted additional medical records, dated

---

Prabhu and Dr. Karelitz.

1  October 25, 2011 and March 13, 2012 to the Appeals Council which have been included in the
2  record. AR 315-318. The handwritten doctor's notes on these records are difficult to read, but
3  appear to indicate that as of March 13, 2012, Ms. Harmon's COPD was stable. The records also
4  appear to indicate that Ms. Harmon was smoking. AR 316.
5        Ms. Harmon testified at the May 11, 2011 hearing that she gets shortness of breath and that
6  she has to sit down because she can't breath and she starts hurting. AR 51. Her counsel asked her:

> Q. [D]o you think there are days during the week when the pulmonary, the breathing problems would prevent you from working?
>
> A. Yeah.
>
> Q. In what way, how would it affect you?
>
> A. I get shortness of breath, I can't breathe, I have to sit down after I'm working so long. I have to sit down because I can't breathe and I start hurting.

13  AR 51.
14        Later in the hearing, Ms. Harmon's attorney asked her why she stopped working in 2009.
15  She stated: "Because of the breathing and the hallucinations." AR 57. Later in the hearing, she
16  testified that the hallucinations she was experiencing were the biggest reason for why she believed
17  she was unable to work. AR 61-62. Finally, she testified: "The worst problem I have is hearing my
18  son talking to me. . . . It makes it where I don't want to be around nobody, I want to stay, you know,
19  in my room by myself. And I feel like everybody's laughing at me, and I'm scared to be out in
20  public with people." AR 65-66.
21        Ms. Harmon testified that she has shortness of breath while standing and walking. AR 52.
22  When asked how often she experiences shortness of breath while standing, she stated "pretty often."
23  She stated that she can stand for "like 30 minutes" and then she has to sit down because she has
24  difficulty breathing. AR 52. She experiences issues with breathing and shortness of breath every
25  day. Id. Ms. Harmon stated that "[e]ven using my breathing machine and my inhalers I have
26  problems still." Id. She stated that the "breathing test" helps her for a couple of minutes only and
27  then she starts experiencing shortness of breath again. AR 61. She stated that she had been using
28  inhalers and a breathing treatment (machine) since the previous year when she went to the

1  emergency room. She testified that the doctor "gave me a prescription for that. So I've been doing it
2  since last year." AR 53. She stated that the breathing treatment and inhalers help "a little bit at first,
3  but its just not for very long a period of time." She testified that she was using the inhaler every day.
4  She further stated: "I'm using the same medication I got from the hospital. I just at first I didn't use
5  it everyday. I just started more recently using it more because I -- I was only taking it as needed at
6  first." Id. Ms. Harmon testified that even with the breathing treatment she believed she would have
7  difficulty working because of her pulmonary problems and also because of the voices that she was
8  hearing. AR 54.

9  Ms. Harmon believed she could stand for a total period of an hour and a half out of an eight
10 hour workday. AR 55. She testified that she can walk for approximately 10 minutes before she has
11 to sit down due to shortness of breath. She stated that she is so limited even with the use of the
12 inhalers and breathing treatment. AR 55. Ms. Harmon estimated that she could walk a total of 30
13 minutes in an eight hour workday. AR 56. Under questioning by the ALJ, Ms. Harmon estimated
14 that she could walk a "couple of blocks" before she had difficulty breathing and had to stop. AR 63.
15 Ms. Harmon also testified that she experiences back pain from prolonged sitting. AR 56. She
16 testified that she needs to stand up after 20 minutes and estimated that she could sit a total of two
17 hours in an eight hour day. AR 57.

18 Ms. Harmon testified that she can lift and carry a gallon of milk, but indicated she needs to
19 use both hands. AR 57-58. She testified that she would probably not be able to carry a gallon of
20 milk for up to three hours during an eight hour day because of her back. She also indicated that she
21 has difficulty breathing when she exerts herself. AR 58.

22 Ms. Harmon's testimony was somewhat unclear regarding the activities she can perform
23 around the house. Her attorney asked her:

24        Q.     Tell us, what are some of the things that you have trouble
  doing?
25
26        A.     Vacuuming. I go -- I can go do dishes, but like halfway
  through I have to stop and sit down.
  AR 58.
27
  Ms. Harmon testified that she can sweep the floor in one room, but then has to stop before
28

8

doing another. She stated that it takes her all day to clean. She also stated that she cannot use chemicals such as bleach because it takes her breath away. AR 59. She testified that she cannot go grocery shopping by herself because it wears her out. She stated that she is fatigued from not being able to adequately sleep. Id. Ms. Harmon testified that she spends a lot of time laying down during the day, approximately 4 hours total throughout the day from 8:00 A.M. to 5:00 P.M. She also testified that she takes naps during the day. AR 60. Ms. Harmon testified that to her knowledge, she has never been diagnosed with sleep apnea. AR 61.[3]

### C.   Administrative Law Judge's June 17, 2011 Decision.

The ALJ applied the five-step sequential evaluation process, discussed hereinafter, in deciding whether Ms. Harmon was or was not disabled. AR 24. At step one, he determined that Ms. Harmon had not engaged in substantial gainful activity since January 11, 2010. At step two, the ALJ found that Ms. Harmon had the following severe impairments: chronic obstructive pulmonary disease (COPD) and obesity. AR 25. The ALJ stated that Ms. Harmon's sleep apnea and fatigue were not considered severe impairments, as they appeared to be controlled, and therefore did not have more than a minimal effect on her ability to perform basic work activities. AR 25. The ALJ also found that Ms. Harmon's allegations pertaining to depression, auditory hallucinations and lower back pain, were not medical determinable. He stated that he nevertheless considered Ms. Harmon's alleged symptoms and limitations associated with all of her impairments, both severe and non-severe, in determining her residual functional capacity. (Id.). At step three, the ALJ found that Ms. Harmon did not have an impairment, or combination of impairments that either met or medically equaled any condition listed in 20 CFR Part 404, Subpart P, Appendix 1. (20 CFR 416.920(d) and 415.926).

Before deciding whether Ms. Harmon could perform her past relevant work, the ALJ determined that Ms. Harmon had the "residual functional capacity" (RFC) to perform the full range of sedentary work as defined in 20 CFR 416.967(a). AR 26-28. In making this finding, the ALJ

---

[3]Dr. Prabhu listed obstructive sleep apnea in his assessment of Ms. Harmon's medical condition on April 19, 2010. (AR 211)

9

noted Ms. Harmon's allegations that her COPD precluded her ability to perform all work related activities, and that she could not stand longer than 30 minutes at a time, walk more than 10 minutes, and sit more than 20 minutes. AR 26. After discussing Ms. Harmon's hearing testimony regarding her auditory hallucinations, the ALJ noted that Ms. Harmon testified that she lies down approximately four hours a day because of fatigue and difficulty breathing. He also noted her testimony that she stays in her room the majority of the day because she felt safer there. The ALJ further noted that Ms. Harmon testified that with breaks, she was able to carry out household work such as doing dishes, laundry, vacuuming and sweeping. She had no problems attending to her personal care and hygiene. Id. The ALJ noted that Ms. Harmon stated that she had interrupted sleep throughout the night, but was not diagnosed with sleep apnea. Id. The ALJ found that Ms. Harmon's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with his RFC assessment that she was capable of performing the full range of sedentary work. Id.

The ALJ also noted that the medical evidence was minimal and did not support Ms. Harmon's complaints of shortness of breath, painful lungs, fatigue, auditory hallucinations, or the degree of their limiting effects. He noted Ms. Harmon's testimony that the inhaler and medication had helped with her symptoms. AR 26. He also noted that the medical records indicated that Ms. Harmon had been noncompliant with her medications or had simply run out of them. AR 26-27. The ALJ also discounted the allegation or testimony that Ms. Harmon had been unable to obtain medication or medical treatment, noting that she visited the hospital emergency room when she had a need for medical treatment and had obtained medication for her COPD. AR 27. The ALJ also discounted Ms. Harmon's testimony that her breathing problems, painful lungs and fatigue rendered her unable to perform any work activities. He noted that despite her assertions of chronic pain and fatigue on minimal assertion, she was able to attend to her personal care and carry out household chores such as vacuuming, washing dishes, laundry and sweeping. AR 27. He also noted that her COPD symptoms appeared to increase during times when she was noncompliant with her medication or had run out of them. Id.

"As for the opinion evidence, the ALJ stated that he "gave significant weight to the opinion

of the Disability Determination Services (DDS) state agency medical consultants who determined the claimant was capable of performing sedentary work." AR 27.  The ALJ found that "[t]his opinion was consistent with the medical evidence, including the objective findings, as well as the record as a whole."  Id.  The ALJ "gave less weight to the opinion of Dr. Prabhu who determined the claimant was capable of lifting ten pounds, occasionally, but could sit no more than four hours, and stand and/or walk less than two hours in an 8-hour workday." AR 27-28.  The ALJ also gave less weight to the letter from Ms. Harmon's son, Johnathan Gardner, which stated that she was unable to work in any occupation because of her impairments.  Id.

Based on his conclusion that Ms. Harmon's RFC was limited to performing sedentary work, the ALJ found at step four of the sequential evaluation, that she was not capable of performing her "past relevant work as a sales associate or retail stocker, which she performed at the heavy exertional level." AR 28.

At step five, the ALJ found that Plaintiff was 44 years old on the date her application for disability benefits was filed which placed her in the category of "younger individual age 18-44." She subsequently changed to the category of a "younger individual age 45-49." (20 CFR 416.963)  Ms. Harmon had limited education and was able to communicate in English.  (20 CFR 416.964). Transferability of job skills was not an issue because Ms. Harmon's past relevant work was unskilled. (20 CFR 416.968).  AR 28.

The ALJ stated that in determining whether Ms. Harmon could make "a successful adjustment to other work," he was required to consider her residual functional capacity, age, education and work experience in conjunction with the Medical-Vocational Guideline, 20 CFR Part 404, Subpart P, Appendix 2.  The ALJ noted that if the claimant can perform all or substantially all of the exertional demands at a given level of exertion, then the medical-vocation rules direct a conclusion of either disabled or not disabled based on the claimant's specific vocational profile.  The ALJ concluded that based on Ms. Harmon's residual functional capacity for the full range of sedentary work, and considering her age, education and work experience, a finding of "not disabled" was directed by Medical-Vocational Rules 201.24 and Rule 201.18.  AR 28-29.  The ALJ accordingly decided that Plaintiff was not disabled.

11

## DISCUSSION

### I. Standard of Review.

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the

District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II. Disability Evaluation Process.

To qualify for disability benefits under the Social Security Act, a claimant must show that (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months, and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b). Second, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id*. § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id*. § 416.920(e). If the claimant can engage

in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f). If the Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

### III. Analysis of the Plaintiff's Alleged Disability.

Plaintiff alleges that the ALJ failed to properly evaluate the medical evidence in assessing her residual functional capacity (RFC). *Motion for Remand and/or Reversal (Doc. #22), pg. 3.* Plaintiff argues that the evidence does not support the ALJ's finding that she is capable of performing the full range of sedentary work. Alternatively, Plaintiff argues that even if the ALJ did not err in finding that she was capable of performing sedentary work, he nevertheless erred in relying on the Medical-Vocational guidelines to conclude that Ms. Harmon is not disabled. Plaintiff argues that the ALJ should have obtained the testimony of a vocational expert regarding her ability to perform available sedentary jobs in light of Dr. Karelitz's opinion, as well as that of Dr. Prabhu, that Plaintiff should avoid exposure to fumes, odors, dusts, gases or poor ventilation.

### A. Whether the ALJ's Finding that Plaintiff was Able to Perform Sedentary Work Was Supported by Substantial Evidence in the Record.

Plaintiff argues that the ALJ improperly gave greater weight to the opinion of the non-examining state agency physician, Dr. Karelitz, over that of the examining physician, Dr. Prabhu. She also argues that the ALJ improperly rejected or discounted the credibility of Plaintiff's testimony regarding the severity of her symptoms and physical limitations.

In *Holohan v. Massanari*, 246 F.3d 1195, 1201-02 (9th Cir. 2001), the Ninth Circuit set forth the rules regarding the weight that is to be accorded to different types of medical opinions:

> Title II's implementing regulations distinguish among the opinions of three types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant [but who review the claimant's file] (non-examining [or reviewing] physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *see* 20 C.F.R. §404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's. *Lester*, 81 F.3d at 830. 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are

14

explained than to those that are not, *see* 20 C.F.R. § 404.1527(d)(3), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists.

"Although the contrary opinion of a non-examining medical expert does not alone constitute a specific legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence that is consistent with other independent evidence in the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001), citing *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989). The ALJ is responsible for determining credibility and resolving conflicts and ambiguities in the medical evidence. *Magallanes*, 881 F.2d at 750.

The ALJ referred to Dr. Prabhu as Ms. Harmon's treating physician. AR 26. The parties agree that Dr. Prabhu was not a treating physician, but rather was an examining physician. *Motion for Remand and/or Reversal (Doc. #22), pg. 5, n. 2*; *Defendant's Cross-motion to Affirm (Doc. #25), pg. 4, n. 2*. This distinction is relevant not only in regard to the standards cited above, but also because Dr. Prabhu only saw Ms. Harmon on one occasion and his assessment of her residual functional capacity was based on the history, examination and testing obtained on that date. It was not based on an ongoing familiarity with the Ms. Harmon's medical conditions that a treating physician is more likely to have. *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to the opinions of your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) . . . .").

Plaintiff asserts that "Dr. Prabhu was aware of Harmon's non-compliance and improvement with bronchodilator therapy and was still of the opinion that Harmon would be limited to less than sedentary exertion." *Motion (#Doc. 22), pg. 6*. Dr. Prabhu's April 19, 2010 report and RFC assessment can arguably be interpreted as finding that Ms. Harmon would be unable to perform sedentary work even if she complied with the prescribed treatment for her COPD. His report and RFC assessment did not expressly address this point, however, and were at least ambiguous as to whether Ms. Harmon would be able to perform sedentary work if her COPD was appropriately treated. There was, in any event, evidence in the record which indicated that Ms. Harmon's COPD symptoms responded to treatment. First, as Dr. Prabhu stated, the pulmonary function test (PFT) showed a significant increase in Ms. Harmon's pulmonary functioning from use of the

bronchodilator. AR 212. Ms. Harmon was subsequently prescribed Albuterol during an emergency room visit in December 2010. AR 261-262. Shortly before the hearing before in May 2011, Ms. Harmon was seen at the University Medical Center (UMC) emergency room for a complaint of chest pain. She underwent a treadmill stress test which was negative for any signs of ischemia and she was discharged in good condition. AR 285. The physical examination on that date also indicated that her lungs were clear bilaterally, and there were no wheezes, rales or rhonchi. The ER physician noted that Ms. Harmon's medications were Albuterol MDI and nebulizer on an as needed basis. He also noted that her COPD "was not an active problem at this moment." AR 279-282. The opinion of the non-examining physician, Dr. Karelitz that Plaintiff was able to perform sedentary work if her COPD was treated with a bronchodilator was consistent with this evidence. The ALJ therefore did not err in giving more weight to Dr. Karelitz opinion regarding Ms. Harmon's residual functional capacity than to Dr. Prabhu's opinion.

In light of Dr. Karelitz's opinion, as well as the other medical evidence in the record, there was also substantial evidence to support the ALJ's conclusion that Ms. Harmon's statements concerning the intensity, persistence and limiting effects of her COPD and fatigue symptoms were not credible to the extent they were inconsistent with the medical evidence. AR 26. The medical evidence also supported the ALJ's decision to give less weight to the opinion of Ms. Harmon's son regarding the extent of her limitations. AR 28. *See Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."). Contrary to Plaintiff's assertion that the ALJ failed to properly evaluate the medical evidence and to set forth legally sufficient reasons for rejecting the opinions of Dr. Prabhu, his decision reflects that he examined and cited all of the relevant medical evidence, including that which indicated that her COPD symptoms improved with treatment. AR 27.

The ALJ's discussion of Plaintiff's ability to take care of her personal hygiene and to perform some household chores, was a factor in, but not critical to his conclusion that she had the capacity to perform sedentary work. The ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment. *Orne v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007). Evidence that a claimant is able to perform household chores and other activities, that involve many of the same

physical tasks as a particular job, provides some evidence that the impairments do not prevent the claimant from working. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). However, "[t]his line of reasoning clearly has its limits: The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Id.*, citing *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986). The ALJ did not err in finding that Ms. Harmon's ability perform household chores on a limited basis, was consistent with Dr. Karelitz's opinion that she has the residual functional capacity to perform sedentary work.

### B. Whether the ALJ Was Required to Obtain the Testimony of a Vocational Expert to Determine Whether There Are Sedentary Jobs That Plaintiff Can Perform.

The ALJ found at step five of the sequential evaluation process that Ms. Harmon was not disabled based on reference to the Medical-Vocational Guidelines. AR. 29. Plaintiff argues that the ALJ was required to obtain the opinion testimony of a vocational expert in order to determine whether there are sedentary jobs available in sufficient numbers the national economy that Plaintiff can perform.

The Commissioner can meet her step five burden in two ways. She can rely on the testimony of a vocational expert or rely on the Medical-Vocational Guidelines at 20 C.F.R. pt.404, subpt. P, app. 2, to support a finding that the claimant can perform work that is available in significant numbers in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir. 2001). Where the claimant has significant non-exertional impairments, however, the ALJ cannot rely on the Guidelines. When testimony of a vocational expert is used at step five, the vocational expert "must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational abilities would satisfy. 20 C.F.R. §404.1566(b)." *Id. See also Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (stating that a vocational expert is required only when there are "sufficiently severe" non-exertional limitations not accounted for in the grid).

Both Dr. Prabhu and Dr. Karelitz found that Ms. Harmon was subject to environmental restrictions. Dr. Prabhu stated that Plaintiff had environmental restrictions for temperature extremes, chemicals and dust. AR 214. Dr. Karelitz stated that Ms. Harmon should avoid all exposure to

fumes, odors, dusts, gases, poor ventilation, etc. AR 247.

Social Security Ruling (SSR) 85-15 states:

> Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.
>
> Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, or other potentially damaging conditions.
>
> Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS.

SSR 96-9P also states that "[r]estrictions to avoid exposure to odors or dust must be evaluated on an individual basis. The RFC assessment must specify which environments are restricted and state the extent of the restrictions; e.g., whether only excessive or even small amounts of dust must be avoided." It further states that:

> When the extent of erosion of the unskilled sedentary occupational base [as a result of nonexertional limitations] is not clear, the adjudicator may consult various authoritative written sources, such as the DOT, SCO, the **Occupational Outlook Handbook** or **County Business Patterns**.
>
> In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. . . .

The Commissioner does not dispute that a finding that Plaintiff had a significant environmental restriction with respect to exposure to fumes, odors, dusts, gases, and poor ventilation would require the ALJ to obtain testimony from a vocational expert to determine if there are available sedentary jobs that Plaintiff could perform. The Commissioner argues, instead, that the Court should infer that the ALJ rejected this restriction based on his finding that Plaintiff had the residual functional capacity to perform "the full range of sedentary work." *Defendant's Cross-Motion (Doc. #25), pgs 6-7.*

The Court is unable to draw such an inference from the ALJ's decision. First, the medical evidence appears undisputed that Ms. Harmon suffers from chronic obstructive pulmonary disease which causes her some level of shortness of breath. Nowhere in his decision did the ALJ discuss Dr.

Karelitz's medical finding that Plaintiff should avoid all exposure to fumes, odors, dusts, gases, or places with poor ventilation. The ALJ stated that he gave significant weight to the opinions of the state agency medical consultants, Dr. Karelitz and Dr. Villaflor, that Ms. Harmon was capable of performing sedentary work. AR 27. In so doing, he gave no indication that he rejected Dr. Karelitz's opinion regarding Plaintiff's environmental restrictions. The only logical inference to be drawn from the ALJ's decision is that he overlooked or failed to consider the environmental restrictions in deciding that Plaintiff was not disabled based on the Medical-Vocational Guidelines.

## CONCLUSION

Having reviewed, considered and weighed both the evidence that supports and the evidence that detracts from the ALJ's conclusion, the Court finds the ALJ's decision that Plaintiff has the residual functional capacity to perform sedentary work is supported by substantial evidence. The Court finds, however, that the ALJ failed to consider the effect of environmental restrictions on Plaintiff's residual functional capacity. The ALJ therefore erred in relying on the Medical-Vocational Guidelines to conclude that Plaintiff was not disabled. He should, instead, have obtained the testimony of a vocational expert as to whether there are sedentary jobs available in sufficient numbers in the national economy that Plaintiff can perform given her significant environmental restrictions. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand and/or Reversal (Doc. #22) be **granted**, and that this matter be remanded to the Social Security Administration for further administrative proceedings, including the obtaining of vocational expert testimony, to determine whether there are sedentary jobs available in sufficient numbers in the national economy that Plaintiff can perform in light of the environmental restrictions on her residual functional capacity.

**IT IS FURTHER RECOMMENDED** that Defendant's Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal (Doc. #25) be **denied** in accordance with the foregoing findings.

. . .

**NOTICE**

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 25th day of October, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge